2015 IL App (1st) 131188

Fifth Division
August 7, 2015

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 01 CR 17942 |
| v. | ) ) | The Honorable |
| JOHNNY HUGHES, | ) ) ) | Timothy Joseph Joyce, Judge Presiding. |
| Defendant-Appellant. | ) ) |  |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     On April 16, 2003, after a jury trial, defendant was found guilty of first degree murder and attempted armed robbery. 720 ILCS 5/9-1(a)(1), 18-2(a) (West 2000). Defendant was sentenced to 55 years with the Illinois Department of Corrections (IDOC). Defendant appealed. On February 2, 2005, the Illinois Appellate Court affirmed defendant's conviction, but remanded for a resentencing hearing. On May 27, 2006, defendant filed a *pro se* postconviction petition, alleging, in part, ineffective assistance of trial counsel because his counsel failed to object to an assistant State's Attorney's (ASA) testimony regarding an

interview between defendant and the ASA, claiming the ASA violated defendant's *Miranda* rights. On December 14, 2006, defendant was appointed postconviction counsel. Postconviction counsel filed a 651(c) certification but did not amend defendant's postconviction petition. On January 9, 2013, the State filed a motion to dismiss. On March 26, 2013, the circuit court held a second stage postconviction hearing and granted the State's motion to dismiss. This appeal followed.

¶ 2        On appeal, defendant claims: (1) the circuit court erred in dismissing defendant's claim that he received ineffective assistance of trial counsel, claiming his counsel did not object to an ASA's testimony in regard to her interview with defendant, when the ASA questioned defendant after he invoked his right to remain silent, in violation of his *Miranda* rights; and (2) defendant received ineffective assistance of postconviction counsel, because his postconviction counsel did not amend his *pro se* postconviction petition to include a claim that the State knowingly presented false testimony from an ASA.  For the following reasons, we do not find defendant's claims persuasive. We affirm.

¶ 3                                                        BACKGROUND

¶ 4                                                  I. Evidence at Trial

¶ 5        The State's case consisted of 11 witnesses: (1) Ruth Bradley, the victim's ex-wife; (2) Tawana Smith, the victim's neighbor; (3) police officer James Duffy, a forensic investigator; (4) police sergeant James Sanchez, who investigated the murder; (5) police detective Gus Vasilopoulos, who investigated the murder; (6) Dr. Joseph Cogan, a forensic pathologist; (7) Julie Wessel, a forensic scientist; (8) Arnold Elliott, who was present at the shooting; (9) Leon Tanna, defendant's friend; (10) an ASA  who questioned Tanna during the grand jury proceedings; and (11) an ASA who took defendant's statement. The State's case also

consisted of stipulations to the testimony of: (1) police sergeant Cogley,[1] who found certain evidence at the crime cene; (2) police officer Kopina, who performed a gunshot residue test on a suspect; (3) police detective Hughes, who found the suspect near the crime scene; and (4) Linda Engstrom, a forensic scientist.

¶ 6                                    A. Ruth Bradley

¶ 7      Ruth Bradley testified that she was the ex-wife of Alex Bradley, the victim. In June 2001, the victim was a "scavenger," meaning that he bought and sold "junk" out of the backyard of his house. Bradley lived across the street from the victim. On June 12, 2001, at 6:30 a.m., Bradley heard a gunshot. Bradley exited her house and observed a white automobile driving away from the alley next to the victim's house. Bradley observed the victim walking along his fence, with one of his hands in the air. Bradley asked the victim what was wrong and he responded "Ruth, Ruth, I've been shot." Bradley ran back inside her house, woke up one of her granddaughters, and they both ran to the victim's yard. Upon entering the victim's yard, the victim was near death. He died shortly thereafter.

¶ 8                                    B. Tawana Smith

¶ 9      Tawana Smith testified that in June 2001, she was a neighbor of the victim. On June 12, 2001, at 6:35 a.m., Smith was exiting her house when she heard a bang, but at the time she believed that it was a noise from a nearby factory. Smith observed a white automobile exiting an alley. The automobile nearly hit Smith, and she instinctively looked at the license plate. Smith observed that the license plate was a handicapped license plate and Smith observed the numbers on the license plate. The automobile was a white Ford Tempo and there were two middle aged African American males in it. Later that day, Smith received a

---

[1] The stipulations do not give the first names of Cogley, Kopina, and Hughes.

telephone call from a police detective, and she informed the detective of the automobile's license plate numbers and the handicapped designation of the license plate, as well as the automobile's color, make, and model. She later identified a picture of the automobile for the detective. In court she identified the automobile again, in a photograph presented to her by the State. This photograph was later admitted into evidence. Smith testified that when she talked to the detective on the phone, she gave the detective the numbers of the license plate out of sequence, because she could not remember the correct sequence of the numbers.

¶ 10                                C. Officer James Duffy

¶ 11          Police Officer James Duffy testified that he was a forensic investigator with the Chicago police department. On June 12, 2001, at 7 a.m., Duffy and his partner, Officer Victor Rivera, were assigned to investigate a crime scene at the victim's house. At the crime scene, Duffy recovered a spent cartridge of a bullet and a "gold bag" that was filled with miscellaneous items. This bag had been moved under a tarp by other unidentified officers, in order to protect it from rain that was beginning to fall.

¶ 12          On cross-examination, Duffy testified that the officers at the scene who moved the gold bag informed him that the bag was found in the alley, near the victim's body. Duffy and Rivera searched the scene for a bullet and for a handgun, but were unable to find either item. Duffy testified that he and Rivera swabbed Jerry Pirtile[2] for gunshot residue (GSR).

¶ 13                        D. Stipulations of Cogley, Kopina, and Hughes

¶ 14          The State then submitted the following three stipulations without objection from the defense.

---

[2] At this point in the proceedings, it was not clear who Pirtile was. However, in the subsequent stipulations it was revealed that Pirtile was initially a suspect in the investigation.

¶ 15     It was stipulated that if Sergeant Cogley were called to testify, he would testify that when he arrived at the victim's house on June 12, 2001, he found a gold bag containing miscellaneous items on the ground near the location where the shell casing was found. Since it was raining, he directed officers to place the bag underneath a nearby tarp.

¶ 16     It was stipulated that if Officer Kopina were called to testify, she would be qualified to testify as an expert in the field of gunshot residue analysis. Kopina performed tests on the GSR sample taken from Jerry Pirtle, which came back negative. This indicated that Pirtle either did not fire a gun, or that the particles were removed by activity or by some other method.

¶ 17     It was stipulated that if Detective Hughes[3] were called to testify, he would testify that he was assigned to investigate the murder of the victim. Hughes found Jerry Pirtile sleeping in a vehicle near the victim's house, and no gun was recovered from Pirtile.

¶ 18                         E. Sergeant James Sanchez

¶ 19     Police Sergeant James Sanchez testified that on June 13, 2001, he was assigned to investigate the victim's murder. As part of the investigation, Sanchez was given the license plate and vehicle information that was given to the police by Smith.[4] Sanchez called Smith on her telephone to confirm that the information he had been provided was accurate, and Smith confirmed the information. Using a police computer, Sanchez performed a search and found a registered white Ford Taurus with a handicapped license plate and the same numbers as those that Smith gave to the police. Sanchez learned that the vehicle was owned by John Neal. Sanchez went to the residence of John Neal, where he observed a white 1991 Ford

---

[3] The record does not reflect if Detective Hughes has any familial connection to defendant.

[4] The record does not reflect which officer collected the vehicle and license plate information from Smith, or which officer provided this information to Sanchez.

Tempo with a handicapped license plate. Neal informed Sanchez that the automobile was often driven by Arnold Elliott, Neal's son. Sanchez took photographs of the automobile, and Smith later identified the photographs as depicting the same automobile that she observed on the morning of June 12, 2001.

¶ 20                                F. Sergeant Gus Vasilopoulos

¶ 21          Police Sergeant Gus Vasilopoulos testified that on June 26, 2001, he was assigned to investigate the victim's murder. Vasilopoulos received information from Arnold Elliot regarding a vehicle that defendant may have been driving. Vasilopoulos and Sanchez drove around the area Elliot indicated defendant could be found until they located his vehicle. The driver of the vehicle stopped the vehicle and began running from the detectives on foot. The detectives pursued him on foot and apprehended the driver. The driver originally told detectives that his name was Jeffrey Tanna, however, detectives later learned that his real name was Leon Tanna.

¶ 22          Vasilopoulos testified that he had a conversation with Leon Tanna, who claimed to be the nephew of defendant. Tanna identified defendant from a photo array and confirmed that the vehicle he was driving belonged to defendant. Vasilopoulos ran a computer search on Tanna and discovered that he was wanted on a homicide warrant. Vasilopoulos learned that defendant was, at that time, in an Indiana prison.

¶ 23          On cross-examination, Vasilopoulos confirmed that Leon Tanna had a warrant out for his arrest in relation to a homicide.

¶ 24                                G. Dr. Joesph Cogan

¶ 25          Dr. Joseph Cogan testified that he was a forensic pathologist currently working as an Assistant Medical Examiner for the Cook County Medical Examiner's Office. Dr. Cogan was

6

admitted as an expert in the field of forensic pathology without objection. Dr. Cogan testified that on June 13, 2001, he performed an autopsy on the victim. Dr. Cogan testified that the victim appeared to be around 69 years of age and that he had died from a gunshot wound. Dr. Cogan testified that the bullet penetrated and exited the victim's body.

¶ 26                                    H. Julie Wessel

¶ 27        Julie Wessel testified that she was a forensic scientist employed by the Illinois State Police in the Forensic Science Center in Chicago, and that she specialized in the area of latent fingerprints. Wessel was accepted as an expert in the area of latent fingerprints and comparisons without objection. Wessel compared a photograph of a latent fingerprint impression that was removed from the gold bag found near the victim to an ink fingerprint card that contained a fingerprint impression from defendant. Wessel testified that the fingerprints were a match.

¶ 28        On cross-examination, Wessel testified that she could not be certain of when defendant's fingerprint was left on the bag.

¶ 29                           I. Stipulation of Linda Engstrom

¶ 30        It was stipulated without objection that if Linda Engstrom were called to testify, she would testify that in July 2015, she was working as a forensic scientist in the Illinois State Police Crime Lab. Engstrom recovered a latent print from the gold bag that was recovered near the victim.

¶ 31                                    J. Arnold Elliott

¶ 32        Arnold Elliott testified that, on June 12, 2001, at 3 a.m., he was driving a Ford Tempo belonging to his father, John Neal, when he stopped to give defendant a ride. Elliott and defendant purchased heroin and cocaine and began imbibing both drugs. Defendant was

carrying a "little shiny bag" containing miscellaneous items that defendant wanted to sell in order to purchase more drugs. Elliott and defendant eventually drove to the alley next to the victim's house in order to sell the bag and its belongings. Defendant exited the vehicle and entered the victim's backyard, at which point the victim's fence obscured Elliott's vision of defendant. Elliott heard a gunshot and then defendant came back from the victim's yard and entered the vehicle. Elliott asked defendant what had occurred, to which defendant responded "just drive."

¶ 33       After Elliott drove away from the victim's house, he again asked defendant what had occurred. Defendant stated that he tried to take the victim's money using a handgun, and the victim grabbed defendant, which caused his handgun to fire. Elliott had not been aware that defendant was carrying a handgun. Elliott then dropped the defendant off at a street corner. Elliott later had a conversation with defendant in which Elliott informed defendant that he should leave town because the police had spoken to Elliott's father about his vehicle and there was a murder investigation associated with the vehicle. Defendant replied "OK." Elliott testified that he was currently imprisoned with a retail theft charge and that he had also served time in prison for armed robbery and gun possession charges. He further testified that he was not receiving any form of compensation or promises for his testimony against defendant.

¶ 34       On cross-examination, Elliott testified that he had sold items to the victim on a previous occasion. Elliott testified that when he first talked to the police he denied having any information regarding the victim's murder. Elliott testified that he had testified in front of a grand jury. During this grand jury testimony, Elliott testified that he had, earlier in the evening but after picking up defendant, given a ride to a third individual. Elliott also testified

in front of the grand jury that defendant did not have the gold bag until after Elliott had stopped at a restaurant, at which point defendant entered the restaurant and spoke to some individuals, and then returned to the vehicle with the bag. Elliott further testified that when he spoke to defendant after the police questioned his father, he told defendant that he was not going to "take the weight" for the homicide that defendant had committed. Elliott testified that he had never told detectives that he loaned defendant his father's vehicle. He also testified that he never told detectives that he was not present when the homicide occurred.

¶ 35                                    K. Leon Tanna

¶ 36        Before testifying, Leon Tanna asked if he could address the court. The trial court excused the jury, and Tanna stated that his police statement contained falsehoods, which Tanna gave to the police only after he was physically abused by the police officers. The trial court informed Tanna that he should only tell the truth during his testimony, and if his testimony was that the police forced him to give a false statement, he could so testify.

¶ 37        Leon Tanna testified that he knew defendant, and that while he often referred to him as "uncle," defendant was actually just a friend. Tanna testified that he was currently incarcerated for first degree murder. Tanna testified that he could not recall if he was driving defendant's vehicle on June 13, 2001, or if he was arrested by the police on that day. Tanna was pursued on foot by police officers at some time in June. Tanna denied ever speaking to police officers about defendant, however, detectives did question Tanna about defendant. Tanna testified that he had never had a conversation with defendant regarding a homicide. Tanna did speak to a "woman" while he was in prison, but could not testify that she was an ASA. Tanna testified that at this meeting, a detective would tell the ASA what to write down, the ASA would write it, and Tanna would reply "yeah" when asked if what the detective had

stated was the truth. Tanna testified that he recalled signing something, but could not recall the ASA "showing" him anything. The State presented Tanna with the statement that was written by the ASA, and Tanna identified that his signature was on every page.

¶ 38        Tanna testified that he had previously testified in front of a grand jury. Tanna testified that there was a police officer in the room when Tanna testified before the grand jury. Tanna testified that he never testified before the grand jury that defendant had stated that he had "stuck up the old man at [victim's street]" or that "he said he had took his money [*sic*] and got his money [*sic*] and everything from him, and the old man had took a swing at him in his reaction, [*sic*] he had pulled the trigger. And he said he didn't know if he killed him or not."

¶ 39        On cross-examination, Tanna testified that when the police asked him about defendant they "slapped him around." Tanna testified that he only agreed to what the police were forcing him to state because of this abuse.

¶ 40        On redirect examination, Tanna testified that when he was processed for entry into prison for his first degree murder charge he did not report any injuries. Tanna testified that he never testified before the grand jury that he had not been abused or coerced into giving his testimony against defendant.

¶ 41                                L. An ASA

¶ 42        The ASA that questioned Tanna during the grand jury proceedings testified that, when Tanna testified before the grand jury, he testified that on June 12, 2001, defendant and Tanna had a conversation at Tanna's aunt's house. Defendant was smiling and when Tanna asked him what he was smiling about, defendant stated that he had robbed an old man on the victim's street and when the old man hit defendant, defendant shot him. Defendant was not aware if the old man had died. Tanna testified that he had not been threatened or given any

promises in order to solicit his testimony. There were no police officers in the room when Tanna testified before the grand jury.

¶ 43        On cross-examination, the ASA testified that when he spoke to Tanna in the ASA's office, before the grand jury, there were police officers present in the room with Tanna.

¶ 44                                M. Detective James Sanchez

¶ 45        Police Detective James Sanchez was recalled by the State and testified that he never struck Tanna during their interview. Sanchez did not observe any other officer strike Tanna, nor did he observe any bruising or red marks on Tanna's face.

¶ 46                                N. An ASA

¶ 47        An ASA testified that, on June 27, 2001, she traveled with Detective Vasalopoulos and Detective Feeney[5] to Indiana to take a statement from defendant. The ASA met with defendant, in the presence of the detectives, in the Indiana prison where defendant was incarcerated for unrelated charges. She informed defendant that she was a prosecutor and not his attorney, and read defendant his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant acknowledged that he understood his rights. Defendant told the ASA that on the morning of June 12, 2001, at around 2 to 2:30 a.m., he was in a white Ford with his friend "Blue." Defendant and Blue smoked crack cocaine and snorted heroine. At some point in the evening, defendant acquired a yellow bag with greeting cards and candles in it. Defendant and Blue drove until it was daylight. Defendant and Blue drove to the victim's house, and Blue parked the vehicle in the alley next to the house. Blue and defendant both exited the vehicle and approached an old man who was standing in the victim's yard. Blue was carrying a handgun. Blue tried to sell the old man the bag, but he was not interested in

_____

[5] Detective Feeney's first name is not reflected in the record.

purchasing it. Defendant then took the bag and placed it on top of a garbage can. Defendant walked back to the vehicle, at which point he heard a gunshot. When the ASA asked defendant to be more detailed, defendant explained that he could not remember the details because he was "high" at the time. Defendant then stated "You know what? That's my story. I'm done talking." The ASA and detectives immediately exited the interrogation room.

¶ 48    Before the ASA and the detectives left the prison, an Indiana sheriff[6] informed them that defendant wanted to speak with them again. Upon reentering the interrogation room, Defendant informed the ASA that he wanted to tell her the truth. The ASA read defendant his *Miranda* rights again and defendant again stated that he understood his rights. Defendant stated that when Blue picked defendant up, he gave defendant a handgun and told defendant that they were going to rob somoene that evening. Defendant and Blue brought the gold bag to the victim's house. Blue parked the vehicle in the alley and defendant and Blue both exited the vehicle. Defendant tried to sell the gold bag with the items it contained to the victim, but he refused to purchase the bag. Defendant became angry that the victim refused to purchase the bag, and he pointed the handgun at the victim and attempted to rob him. Defendant put his hand in the victim's shirt pocket, at which time the victim pushed defendant's arm away and defendant's handgun fired. Defendant and Blue then drove from the scene of the crime. Defendant stated that on June 12, 2001, he had a conversation with Leon Tanna in which defendant described the homicide.

¶ 49    The ASA asked defendant how he would like to memorialize his statement. Defendant stated that he did not want to sign a handwritten statement because "that's like signing a confession and he was going to come to court and deny it all anyway." Defendant

---

[6] This officer's name is not reflected in the record.

also refused to have a court reporter record his statement, because defendant did not trust the court reporter. Defendant also did not want to videotape his statement because he believed that videotapes lie. Defendant then demanded that he receive a deal for his testimony against Blue. The ASA informed defendant that she could not, at that time, offer him a deal. When defendant heard this, he lifted his shirt over his head and put his head down on the table. The ASA then left the room and discontinued contact with defendant.

¶ 50　　　　The ASA testified that on July 3, 2001, she also interviewed Leon Tanna. Tanna was in custody at the time, and the ASA interviewed him in front of Detective Feeney. The interview was primarily a conversation between the ASA and Tanna. Tanna answered the ASA's questions in full sentences. Tanna told the ASA that he had a conversation with defendant on June 12, 2001. Defendant was smiling and told Tanna that he had robbed an old man, that the old man had attempted to hit defendant, and that defendant had shot him. Defendant was not sure if he had killed the old man. Defendant told Tanna that he shot the old man on "reflex." Tanna stated that he was treated well by the police. The ASA did not notice any injuries or marks on Tanna. The ASA documented the interview in a handwritten statement. Tanna was allowed to review the statement to make any changes or corrections, and then Tanna signed each page of the statement.

¶ 51　　　　On cross-examination, the ASA testified that when she and the detectives interviewed defendant, the detectives talked to defendant by themselves for about 15 minutes before the ASA entered the room to conduct the interview. The ASA testified that after the first interview, she was not sure how long the Indiana sheriff spent with defendant before the sheriff told her that the defendant would like to speak to her again. She testified that there was never any written statement from defendant.

¶ 52    The State then rested its case. The defense moved for a directed verdict, which was denied. The defense did not present any witnesses, and rested its case.

¶ 53                    II. Conviction and Sentencing

¶ 54    On April 16, 2003, the jury returned a verdict of guilty against defendant for first degree murder and two counts of attempted armed robbery.

¶ 55    On May 29, 2003, defendant argued his posttrial motion for a new trial, which was denied. In aggravation, the court heard that defendant had a number of past criminal convictions, that defendant had only been employed three times and had quit his most recent job a month before the homicide occurred, that defendant was a gang member, and that defendant had used a firearm in the offence. In mitigation, the court heard that defendant was under the influence of drugs at the time of the offense, and that the offence was not planned. The court then sentenced defendant to 55 years for first degree murder and 10 years for attempted armed robbery, to run concurrently, with the IDOC.

¶ 56                           III. Direct Appeal

¶ 57    On this direct appeal, defendant claimed that: (1) the circuit court erred in admitting a witness's prior inconsistent statement as substantive evidence; (2) prosecutorial misconduct during the trial and in closing argument deprived him of a fair trial; (3) he received an unconstitutional sentence when the court imposed the 25-to-life sentence enhancement mandated by section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2000)); (4) one of his convictions for attempted armed robbery must be vacated under one-act one-crime principles; and (5) the mittimus should be corrected to reflect that attempted armed robbery is a Class 1, rather than a Class X offense.

¶ 58    On February 2, 2005, we found that: (1) Tanna's prior inconsistent statement to the ASA was properly admitted into evidence for impeachment purposes; (2) there was no prosecutorial misconduct; and (3) the 25-year firearm enhancement did not violate defendant's due process rights, did not create a disproportionate sentence, and did not create an impermissible double punishment. *People v. Hughes*, No. 1-03-1898 (2005) (unpublished order under Supreme Court Rule 23). We also found that: (1) the mittimus was to be corrected to reflect a conviction of only one count of attempted armed robbery as a Class 1 felony; and (2) the case was remanded for resentencing in order to clarify that defendant's 55-year sentence included the 25-year mandatory enhancement for the use of a firearm. *People v. Hughes*, No. 1-03-1898 (2005) (unpublished order under Supreme Court Rule 23).

¶ 59                          IV. Postconviction Petition

¶ 60    On May 17, 2006, defendant filed a *pro se* petition for postconviction relief. In the postconviction petition, defendant claimed: (1) ineffective assistance of counsel at trial because his counsel failed to object to the ASA's testimony regarding her interview with defendant, claiming the interview was in violation of defendant's *Miranda* rights; (2) ineffective assistance of counsel at trial because his counsel failed to object to improper hearsay testimony; (3) prosecutorial misconduct during closing arguments; (4) ineffective assistance of counsel at trial because his counsel failed to challenge the chain of custody for certain evidence; and (5) ineffective assistance of counsel on appeal because his counsel did not raise the first four claims asserted in defendant's postconviction petition on direct appeal. Attached to defendant's petition was a signed affidavit by defendant in which he stated that he never waived his *Miranda* rights, but was interrogated at length by the ASA after having

invoked his right to remain silent. Defendant's affidavit also averred that defendant never spoke to the ASA, except to tell her that he did not have any knowledge of the homicide.

¶ 61        On December 14, 2006, counsel was appointed to represent defendant for his postconviction proceedings. On March 19, 2009,[7] defendant's postconviction counsel alerted the circuit court that the resentencing hearing ordered by the appellate court had not been held.  On June 25, 2009, the trial court held defendant's resentencing hearing. The trial court determined that defendant was sentenced for 55 years with IDOC for first degree murder. The sentence was 30 years for first degree murder and 25 years for the mandatory firearm enhancement.

¶ 62        On October 17, 2012, defendant's postconviction counsel filed a 651(c) certification. On January 9, 2013, the State filed a motion to dismiss defendant's postconviction petition. On the same day, the trial court met with counsel to discuss scheduling. During this meeting, defendant's postconviction counsel informed the court that she had located two of the witnesses defendant had asked her to locate, but neither witness would be of assistance in the case. Counsel was still attempting to locate two more witnesses, for whom defendant did not have current addresses. On March 26, 2013, the trial court heard the State's motion to dismiss. The trial court granted the State's motion. In discussing the first count, ineffective assistance of counsel for failure to object to the ASA's testimony, claiming the interview was in violation of defendant's *Miranda* rights, the trial court stated:

---

[7] During the postconviction process, defendant filed a motion to have his postconviction attorney removed, and then retracted the filing. Defendant's case was at one point dropped off the call, and had to be reinstated by his postconviction counsel. This accounts for the length of time between the filing of defendant's *pro se* postconviction petition and the second stage postconviction hearing.

"The difficulty with that claim though is that [defendant's] affidavit says he never made any such statements. It's very clear in that regard. *** 'I told the [ASA] I did not have any information to offer because I did not know about the case. After I asked to remain silent, the [ASA] continued the interrogation and I simply pulled my shirt over my head placing my head down. Even though I refused to give up my right to remain silent, I was still continuously interrogated.' That's the end of the affidavit. Accepting just for the purpose of this motion to dismiss, which I do accept the truth of those allegations, it may well be that [defendant's] testimony, if believed, would establish a violation perhaps of *Edwards v. Arizona*, but according to his own testimony, had it been presented by his trial counsel, there would be nothing to suppress because there are no fruits accumulating or accrediting to the State's benefit, so to speak, or in your end to [defendant's] detriment in light of his claim—because he claims to have not confessed or made any statements to [the ASA], other than telling her pursuant to paragraphs 5 and 6, he refused to answer questions, and told her he did not have any information to offer because he does not know about the case.

The upshot of that or its import is that, even assuming its truth and presuming that trial counsel was ineffective for failing to litigate that issue that [defendant] claims should have been litigated, even had it been satisfied to the trial court's satisfaction, if [defendant] was believed in that regard and he would have to have been believed for the trial court to reach that conclusion, there would be nothing for the trial court to suppress because [defendant] claims not to have made any statements. It's circuitous reasoning. It's certainly not something that trial counsel would reasonably be anticipated to put forth. And I do not believe that as stated, the claims raised by

17

[defendant] in paragraph 1 of his petition, or paragraph A as he styles it, constitutes a substantial showing of ineffective assistance of counsel that would motivate the court to go on to a third stage hearing."

¶ 63    This appeal followed.

¶ 64                                    ANALYSIS

¶ 65    On appeal, defendant claims: (1) the circuit court erred in dismissing defendant's claim that he received ineffective assistance of counsel at trial because his counsel did not object to the ASA's testimony in regard to her interview with defendant, claiming the interview was in violation of defendant's *Miranda* rights; and (2) defendant received ineffective assistance of counsel because his postconviction counsel did not amend his *pro se* postconviction petition to include a claim that the State knowingly presented false testimony from the ASA.  For the following reasons, we do not find defendant's claims persuasive. We affirm.

¶ 66    "The [Post-Conviction Hearing] Act provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding not involving the death penalty contains three distinct stages. *Hodges*, 234 Ill. 2d at 10.

¶ 67    At the first stage, the trial court must, within 90 days of the petition's filing, independently review the petition and determine whether "the petition is frivolous or is patently without merit." (Internal quotation marks omitted.) *Hodges*, 234 Ill. 2d at 10. If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. *Hodges*, 234 Ill. 2d at 10; see section 122-2.1(a)(2) of

18

the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-2.1(a)(2) (West 2012)). If the court does not dismiss the petition as frivolous or patently without merit, then the petition advances to the second stage, where counsel may be appointed to an indigent defendant (725 ILCS 5/122-4 (West 2012)), and the State is allowed to file a motion to dismiss or an answer to the petition (725 ILCS 5/122-5 (West 2012)). *Hodges*, 234 Ill. 2d at 10-11.

¶ 68        At the second stage, the trial court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If no such showing is made, the petition is dismissed. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). If, however, a substantial showing of a constitutional violation is set forth, the petition is advanced to the third stage, where the trial court conducts an evidentiary hearing. *Edwards*, 197 Ill. 2d at 246; *Pendleton*, 223 Ill. 2d at 473; see 725 ILCS 5/122-6 (West 2012).

¶ 69        To proceed pursuant to the Act, defendant files a petition in the trial court in which the original proceeding took place. *Hodges*, 234 Ill. 2d at 9. In the first stage, section 122-2 of the Act requires that a postconviction petition must, among other things, " 'clearly set forth the respects in which petitioner's constitutional rights were violated.' " *Hodges*, 234 Ill. 2d at 9 (quoting 725 ILCS 5/122-2 (West 2006)). Defendant, at the first stage, need only present a limited amount of detail in the petition. *Hodges*, 234 Ill. 2d at 9. Since most petitions are drafted at this stage by defendants *pro se*, this court views the threshold for survival as low. *Hodges*, 234 Ill. 2d at 9. We only require that a *pro se* defendant allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act. *Hodges*, 234 Ill. 2d at 9; see *People v. Porter*, 122 Ill. 2d 64, 74 (1988) (stating that

only a "gist" of a constitutional claim is needed at this stage (internal quotation marks omitted)).

¶ 70       Throughout the second and third stages of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. At the second stage proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and, in the event the trial court dismisses the petition at that stage, we review the circuit court's decision under a *de novo* standard of review. *Pendleton*, 223 Ill. 2d at 473. *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 71       In considering whether the petition alleges facts sufficient to state the gist of a constitutional claim, " 'the court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceeding.' " *People v. Brown*, 236 Ill. 2d 175, 202-03 (2010) (quoting 725 ILCS 5/122-2.1(c) (West 2006)). The allegations made in the postconviction petition must also be considered in light of the facts known to the trial court at the time. *Brown*, 236 Ill. 2d at 203. See *People v. Moore*, 189 Ill. 2d 521 (2000).

¶ 72                      I. Dismissal of the Postconviction Petition

¶ 73       Defendant first claims that the circuit court erred in dismissing his postconviction petition claim that he received ineffective assistance at trial because his counsel did not object to the ASA's testimony in regard to her interview with defendant, because the interview was in violation of defendant's *Miranda* rights.

¶ 74     A defendant has a sixth amendment right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which the Illinois Supreme Court adopted in *People v. Albanese*, 102 Ill. 2d 54 (1984).

¶ 75     Under *Strickland,* a defendant must prove both that: (1) his attorney's actions or inactions constituted error(s) so serious as to fall below an objective standard of reasonableness "under prevailing professional norms" (*People v. Colon*, 225 Ill. 2d 125, 135 (2007); *People v. Evans*, 209 Ill. 2d 194, 220 (2004)); and (2) defense counsel's deficient performance prejudiced the defendant. *Hodges*, 234 Ill. 2d at 17 (citing *Strickland*, 466 U.S. at 687-88). "Under the first prong of the *Strickland* test, the defendant must prove that his attorney's performance fell below an objective standard of reasonableness" "under prevailing professional norms." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135 . Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. (Internal quotations marks omitted.) *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 76    The State first contends that defendant has forfeited this issue because the ineffective assistance of counsel claim could have been raised on direct appeal. " 'The purpose of the post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction that have not already been adjudicated or could have been.' " (Emphasis omitted.) *People v. Stewart*, 121 Ill. 2d 93, 104 (1988) (quoting *People v. Silagy*, 116 Ill. 2d 357, 365 (1987)). "Thus, '[t]he judgment of the reviewing court on a previous appeal is *res judicata* as to all issues actually decided, and any claim that could have been presented to the reviewing court in the direct appeal is, if not presented, thereafter barred under the doctrine of waiver.' " *Stewart*, 121 Ill. 2d at 104 (quoting *Silagy*, 116 Ill. 2d at 365).

¶ 77    However, there was no evidence at trial that the ASA violated defendant's *Miranda* rights, and thus the claim relies on facts that are outside the record that could not have been raised on appeal. See *People v. Harris*, 206 Ill. 2d 1, 13 (2002) ("where the facts relating to the claim do not appear on the face of the original appellate record," forfeiture rule relaxed); see also *People v. Barkes*, 399 Ill. App. 3d 980, 986 (2010) (ineffective assistance of counsel claim in postconviction petition not forfeited where claim is based on information the defendant's counsel told or did not tell defendant, which was outside the record). In *People v. Jones*, 364 Ill. App. 3d 1 (2005), the appellate court held that an ineffective assistance of counsel claim was not forfeited when the defendant claimed his trial counsel failed to present exculpatory testimony from witnesses he had interviewed. *Jones*, 364 Ill. App. 3d at 5. These claims were not based on the record, as the evidence was only available through affidavits attached to defendant's postconviction petition. *Jones*, 364 Ill. App. 3d at 4. Similarly, in the case at bar, there was no evidence presented at trial that defendant's *Miranda* rights were violated because the defendant did not take the stand or produce any witnesses. There is also

22

no evidence in the record pertaining to whether defendant's attorney was aware of the alleged *Miranda* violations. Accordingly, defendant's claim is based on information outside the record, and we do not find that defendant forfeited this issue.

¶ 78     We agree with defendant that the trial court erred in finding that defendant's claim that he never gave a statement to the ASA barred him from asserting that any statement procured by the ASA was taken in violation of his *Miranda* rights. "The law is settled that a defendant's assertion that he did not confess does not preclude the alternative argument that any confession should be suppressed." *People v. Wrice*, 2012 IL 111860, ¶ 53 (citing *People v. Norfleet*, 29 Ill. 2d 287, 289-91 (1963)); see also *Ashcraft v. Tennessee*, 322 U.S. 143, 152 n.7 (1944) ("The use in evidence of a defendant's coerced confession cannot be justified on the ground that the defendant has denied he ever gave the confession."). Thus, even though defendant claimed that he never gave a statement, had defendant told his trial counsel that the ASA violated his *Miranda* rights, trial counsel could have made a separate motion *in limine* to suppress the ASA's testimony for violation of those rights. *Wrice*, 2012 IL 111860, ¶ 53.

¶ 79     This does not, however, end our analysis. In reviewing the dismissal of a postconviction petition, the reviewing court may affirm on any basis supported by the record. *People v. Stoecker*, 384 Ill. App. 3d 289, 292 (2008). In the case at bar, defendant never stated in his affidavit or his postconviction petition that he informed his trial counsel that the ASA violated his *Miranda* rights. Thus, even if we are to accept that every claim stated in defendant's affidavit is true, there is no evidence, either in the record or in defendant's affidavit, that demonstrates that his trial counsel could have made a motion to suppress the ASA's testimony concerning defendant's statement based on *Miranda* violations that would

23

have been granted. We cannot find that defendant's attorney failure to object to the ASA's testimony fell below an objective standard of reasonableness. *Colon*, 225 Ill. 2d at 135.

¶ 80    Defendant argues that his postconviction petition and affidavit implied that his trial counsel was aware of the alleged *Miranda* violation. However, even if we were to assume that defendant's affidavit does imply that his trial counsel knew of the claimed *Miranda* violation, we find that defendant's claim fails for other reasons.

¶ 81    At the second stage of the postconviction petition the burden on defendant is higher, and he must make a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. Defendant asserts that we must take everything stated in his affidavit as true, however, these facts must be "well[]pleaded." *Pendleton*, 223 Ill. 2d at 473. Moreover, the court must determine if the pleading and *any accompanying documentation* make a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. We do not find that defendant's accompanying documentation, consisting solely of his own affidavit that his *Miranda* rights were violated, makes a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473.

¶ 82    In *People v. Deloney*, 341 Ill. App. 3d 621 (2003), we found that a defendant's postconviction petition that claimed that his confession was coerced, and was substantiated by little more than his own affidavit stating that his confession was coerced, was "nothing more than a general allegation that is unsubstantiated by the tenuous evidence he offers with his petition" and was thus properly dismissed during the first stage of postconviction proceedings. *Deloney*, 341 Ill. App. 3d at 631. *Deloney* noted that "in order to determine whether a 'gist' of a meritorious constitutional claim has been presented, the court must

inquire into the relevance and merit of the defendant's supporting documents." *Deloney*, 341 Ill. App. 3d at 627.

¶ 83    In the case at bar, the only supporting document provided by defendant is his own affidavit stating that the ASA violated his *Miranda* rights. This is not enough to support the "gist" of a meritorious constitutional claim, let alone a substantial showing of a constitutional violation, as required in the second stage. *Deloney*, 341 Ill. App. 3d at 627; *Pendleton*, 223 Ill. 2d at 473. Were this enough, every single convicted defendant would be entitled to a third-stage evidentiary hearing by simply filing a postconviction petition alleging that a detective, police officer, or ASA violated his or her *Miranda* rights, and that this violation was simply not raised at trial. We also note that the record reveals that defendant's postconviction counsel interviewed two witnesses that defendant informed her could support his claim that his *Miranda* rights were violated, and neither of these witnesses had information that defendant's postconviction counsel believed would support his claim. We accordingly find that defendant has not met the burden of making a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473.

¶ 84                    II. Ineffective Assistance of Postconviction Counsel

¶ 85    Defendant next claims that he received ineffective assistance of counsel because his postconviction counsel did not amend his *pro se* postconviction petition to include a claim that the State knowingly presented false testimony from the ASA. Specifically, defendant claim that, because of the ASA's fabricated testimony, defendant's due process rights were violated in accordance with *Napue v. Illinois,* 360 U.S. 264 (1959).

¶ 86    Defendant's right to assistance of counsel in postconviction proceedings is statutory, not constitutional. *People v. Suarez,* 224 Ill. 2d 37, 42 (2007). According to the Act,

defendant is to be provided a reasonable level of assistance during postconviction proceedings. 725 ILCS 5/122-1 (West 2012). "The degree of skill and care that a lawyer must exercise in representing a postconviction petitioner is not 'effective assistance of counsel' and is, therefore, not governed by the familiar two-part test first enunciated in *Strickland v. Washington* [citation]." *People v. Rials*, 345 Ill. App. 3d 636, 641 (2003).

¶ 87      Rather, at second-stage postconviction proceedings under the Act, a defendant is entitled only to a "reasonable" level of assistance. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). To ensure such assistance, Rule 651(c) requires that postconviction counsel: (1) consult with the petitioner either by mail or in person to ascertain the contentions of deprivation of constitutional rights; (2) examine the record of the trial court proceedings; and (3) make any amendments to the *pro se* petition necessary for an adequate presentation of the petitioner's contentions. *Perkins*, 229 Ill. 2d at 42. Rule 651(c) requires a showing that counsel took necessary steps to secure adequate representation of defendant's claims. *Perkins*, 229 Ill. 2d at 42. Filing a Rule 651(c) certificate gives rise to a presumption that counsel provided reasonable assistance during second-stage proceedings under the Act. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). See *People v. Jones*, 2011 IL App (1st) 092529, ¶ 23. Our review of compliance with Rule 651(c) is *de novo. People v. Jones*, 2011 IL App (1st) 092529, ¶ 19 (citing *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007)). As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *BDO Seidman, LLP*, 408 Ill. App. 3d at 578).

¶ 88      In the case at bar, postconviction counsel filed a Rule 651(c) certificate. The record reveals that she communicated with defendant, interviewed two witnesses that defendant

asked her to locate, attempted to find two more witnesses for whom she did not have current addresses, and verified that defendant's *pro se* postconviction petition adequately represented defendant's contentions. *Perkins*, 229 Ill. 2d at 42. Notably, defendant does not claim that postconviction counsel failed to amend his postconviction petition to adequately represent his contentions, rather, he claims counsel was ineffective for not adding a completely separate claim.

¶ 89        " '[P]ostconviction counsel is not required to comb the record for issues not raised in the defendant's *pro se* postconviction petition.' " *Rials*, 345 Ill. App. 3d at 641 (quoting *People v. Helton*, 321 Ill. App. 3d 420, 424-25 (2001)). "Counsel is obligated to amend defendant's *pro se* petition only when necessary to adequately present the claims defendant had already raised in his petition and while counsel *may* add new claims, he is not required to amend defendant's *pro se* postconviction petition to include new issues." (Emphasis in original.) *Rials*, 345 Ill. App. 3d at 641; see also *People v. Davis*, 156 Ill. 2d 149, 164 (1993) ("Post-conviction counsel is only required to investigate and properly present the *petitioner's* claims." (Emphasis in original.)).

¶ 90        We find *People v. Milam*, 2012 IL App (1st) 100832, instructive. In *Milam*, the defendant claimed in his postconviction petition that he received ineffective assistance because of counsel his trial counsel failed to call an attorney as a witness during a suppression hearing. *Milam*, 2012 IL App (1st) 100832, ¶ 30. The defendant claimed that the attorney would testify that he had informed the police officers not to talk to defendant until they contacted him. *Milam*, 2012 IL App (1st) 100832, ¶ 30. After the defendant's postconviction petition was dismissed, he appealed, claiming ineffective assistance of postconviction counsel, because his counsel failed to add a claim that defendant's waiver of

27

his *Miranda* rights was invalid because a different attorney was prevented from meeting with the defendant until after defendant had waived his *Miranda* rights. *Milam*, 2012 IL App (1st) 100832, ¶ 30. We affirmed the circuit court's dismissal of the defendant's postconviction petition, noting that while both claims sought the same remedy, they were in essence two separate claims, each relying on a different legal theory and facts. *Milam*, 2012 IL App (1st) 100832, ¶ 31.

¶ 91    In the case at bar, defendant claimed in his *pro se* postconviction petition that his *Miranda* rights were violated because the ASA continued to interview him after he invoked his right to remain silent. The *Napue* claim would have been a distinct and separate claim that postconviction counsel was not required to add to defendant's petition. *Rials*, 345 Ill. App. 3d at 641. A *Miranda* violation, as stated in defendant's postconviction petition, would require evidence that defendant was questioned after invoking his right to remain silent. *Edwards v. Arizona*, 451 U.S. 477, 486-87 (1981). The *Napue* claim would have required evidence that the ASA testified falsely and that the State was aware of this testimony. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This would have required exploration outside of defendant's postconviction petition to find new evidence to support a separate claim, and we have noted that our supreme court has held that reasonable postconviction representation does not include " 'exploration, investigation and formulation of potential claims.' " *People v. Vasquez*, 356 Ill. App. 3d 420, 425 (2005) (quoting *People v. Davis*, 156 Ill. 2d 149, 163 (1993)).

¶ 92    Moreover, postconviction counsel is not required to amend a petition in an effort to state matters either not in existence or unsupported by the record. *People v. White*, 198 Ill. App. 3d 781, 787 (1989). There was no evidence in the record, and nothing attached to

defendant's petition, besides his own affidavit stating "After I asked to remain silent that [ASA] continued the interrogation and I simply pulled my shirt over my head placing [*sic*] my head down," to support an assertion that the ASA fabricated testimony and that the State was aware that the testimony was fabricated. Accordingly, we do not find that defendant has overcome the presumption, created by his postconviction counsel's filing of a 651(c) certificate, that defendant received effective assistance of postconviction counsel. *Jones*, 2011 IL App (1st) 092529, ¶ 23.

¶ 93                                    CONCLUSION

¶ 94        For the foregoing reasons, we do not find persuasive defendant's claims that: (1) the circuit court erred in dismissing defendant's claim that he received ineffective assistance of trial counsel; and (2) defendant received ineffective assistance of postconviction counsel.

¶ 95            Affirmed.